604 S.E.2d 369

**In the Matter of Mark Douglas LATTIMORE, Respondent.**

No. 25882.

Supreme Court of South Carolina.

Submitted Oct. 5, 2004.

Decided Oct. 25, 2004.

---

Henry B. Richardson, Jr., Disciplinary Counsel, and Barbara M. Seymour, Senior Assistant Disciplinary Counsel, both of Columbia, for Office of Disciplinary Counsel.

J. Steedley Bogan, of Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to either an indefinite suspension or disbarment. We accept the agreement and disbar respondent from the practice of law in this state. The facts, as set forth in the agreement, are as follows.

## *FACTS*

Respondent was admitted to the practice of law in North Carolina in 1996 and the practice of law in South Carolina in 1998. From 1998 until 2000, he worked as an associate for the law firm of Forquer & Green in the firm's Charlotte office. In 2000, respondent formed the partnership of Forquer, Green & Lattimore with offices in Greenville and Charleston. In 2001, the firm of Forquer, Lattimore & Calloway was formed to succeed Forquer & Green in Charlotte. Neither Forquer, Green, nor Calloway are licensed to practice law in South Carolina.

The primary business of Forquer, Green & Lattimore was residential real estate closing services. Respondent worked out of the Greenville office from early 2001 until August 2003.

The firm employed various associates licensed in South Carolina until its dissolution upon respondent's departure.

## I.

On December 17, 2002, respondent conducted a residential real estate closing for Client A. For her convenience, respondent traveled from his office in Greenville to Anderson to conduct the closing. Respondent did not bring any witnesses to the closing and conducted the closing with only Client A present. Upon his return to the office, non-lawyers signed as witnesses and notary on the closing documents.

Respondent acknowledges that non-lawyers signing closing documents as witness or notary when they were not present at the closing was routine in his office, especially during a period of high volume that occurred as a result of the low interest rates from 2002 through 2004. Respondent further admits that, on occasion, his staff would witness and notarize documents prior to closing and prior to execution by the signatory. Respondent states this practice violated his own policies and procedures, but acknowledges he is responsible.

In the Greenville office during this high volume period, non-lawyers conducted real estate closings outside the presence of a licensed attorney. Although respondent had policies in place against this practice, he acknowledges it did occur and that he is responsible for creating an environment in which the practice was tacitly condoned.

## II.

Respondent failed to complete his mandatory continuing legal education (CLE) requirements for 2002. He filed an incomplete reporting affidavit with the Commission on Continuing Legal Education and Specialization (the Commission). On February 7, 2003, respondent was served with a notice from the Commission that his licensed to practice law was suspended as of February 5, 2003, for failing to meet mandatory CLE requirements. Respondent subsequently obtained the credits needed for compliance and filed an amended affidavit. His administrative suspension was lifted on February 26, 2003.

While suspended, respondent continued to practice law. Eighty-four closings were conducted in the Greenville office during the twenty-one days in which respondent was suspended. During this period of time, no licensed attorneys worked in the Greenville office. Respondent acknowledges he was aware he was suspended and not permitted to practice law, but nevertheless admits he made a conscious decision to continue to do so.

## III.

In August 2001, respondent conducted a real estate closing in which Clients B & C sold one of two adjacent lots they owned. The lot sold had a house on it; the adjacent lot was empty. As a result of errors in the title search, the closing documents conveyed and encumbered the empty lot rather than the lot with the house that the clients had intended to sell.

In Spring 2002, respondent was informed of the error. Respondent corrected the problem by having the clients and the buyer sign reciprocal deeds. Respondent failed, however, to secure a release of the empty lot from the buyer's mortgage company until July 2003, after receiving notice of the grievance filed by Client B and C. This caused a several month delay in Client B and C's sale of the empty lot to a new buyer. Respondent failed to adequately communicate with Client B and C during the time he was attempting to solve the problems.

## IV.

On January 9, 2003, respondent conducted a real estate closing in which Client D and E were selling their home to buyer. Through no fault of respondent, the lender did not fund the loan and the transaction had to be cancelled.

When the problems were resolved, the closing was rescheduled for February 11, 2003. Respondent conducted the second closing even though he was aware his license to practice law was suspended. Respondent's partner, Green, was present in the office when the loan was closed, but Green was not licensed to practice law in this state. Respondent failed to sign some of the closing documents. A non-lawyer in the

office subsequently signed respondent's name to the closing documénts without indicating someone was signing for him. This was not done with respondent's specific authorization, however, respondent acknowledges he was responsible for creating an environment in which non-lawyers in his office would assume the practice was acceptable.

## V.

From March 2001 through July 2002, the Greenville office of Forquer, Green & Lattimore conducted 166 closings in which National City Mortgage was the lender. In instances in which the loans were for refinancing rather than purchase money purposes, representatives of the lender insisted that the closing be done prior to completion of the title search and the title work be done during the three-day recession period. Respondent advised the borrowers in these cases that the title search had not been conducted and that the closings would not be completed or the loans funded until the title work was complete. Respondent instructed the borrowers to sign closing documents without property descriptions. The property descriptions would be added once the title work was complete. This process was contrary to the firm's standard practice and, as a result, the post-closing process in many of the files was not timely handled. In forty-eight of the National City files, the mortgages were not recorded as of January 2003. By the time respondent was contacted by National City Mortgage, many of the mortgages had been lost and had to be re-executed.

It was the firm's practice to collect the title insurance policy premium from the closing and then issue a separate check once respondent issued the title opinion. Forquer visited the office periodically to collect the premium checks. It was his responsibility to pay the premium over to the title company which would then issue the policy. In approximately eighty-four of the National City Mortgage closings, premiums were collected, but policies were not issued.

## VI.

Respondent received a significant portion of his business in Anderson from three mortgage loan brokerage companies.

Certain employees and owners of these mortgage loan broker-
age companies conspired with certain loan officers employed
by National City Mortgage and certain real estate appraisers
to obtain loans on properties for more than the properties
were worth using inflated appraisals. (The mortgage brokers,
loan officers, and appraisers are referred to collectively as
"Co–Conspirators."). Respondent conduct the closings on
many of the properties involved in the conspiracy.

In several instances, the Co–Conspirators obtained the
fraudulent loans by using a practice known as property "flip-
ping." In an illegal property flip, a straw buyer or co-
conspirator (Buyer A) will enter into a contract to purchase
property for its actual value from the Seller. Buyer A will not
obtain financing but will, instead, enter into a contract to sell
the property to a co-conspirator (Buyer B) at an inflated price.
Buyer B will then use an appraisal for the inflated price to
obtain a loan. Closings on the sale from Seller to Buyer A
and from Buyer A to Buyer B are done at the same time.
Buyer A will pay the contract price to Seller from the loan
proceeds and will then often split the difference with Buyer B.
The actual transaction is contrary to the information contained
on the HUD–1 forms, which misrepresents the sales prices
and the source of the funding for the purchases and often
falsely indicates that the buyers are contributing significant
down payments in cash. According to the Agreement for
Discipline by Consent, when no payments are made to the
lender and the property is foreclosed, the lender can recoup
only the actual value of the property rather than the amount
loaned on the inflated appraisal.

An illegal property flip generally requires the conspiracy of
at least one of the buyers, an appraiser, and a mortgage
broker or loan officer. It also requires the assistance of an
attorney who is aware of the fraud, chooses to look the other
way, or who fails to supervise non-lawyer assistants engaging
in the unauthorized practice of law. In order for the flip to
work, the same attorney has to close both transactions. If an
attorney conducts a closing on property for a certain sales
price and funds that closing with proceeds from the immediate
resale of the same property for a significantly higher amount,
the attorney has constructive notice that the second sale might
be based on a fraudulently inflated appraisal of the property.

This is particularly true when the buyer leaves the closing with both the property and with money from the loan.

In the case of the loans closed by respondent, in addition to the constructive notice described above, respondent had actual knowledge in at least two of the transactions that the appraisals were inflated. In several of the transactions, respondent falsely represented on closing documents that mortgage broker fees to a Co–Conspirator were payments to creditors of the borrower.

Respondent was on further notice that the conduct of the Co–Conspirators might be illegal because, in connection with several of the closings, the documents reflected that the loans were for refinancing rather than purchase money. At the same time, respondent prepared documents actually conveying the property. Additionally, at least one Co–Conspirator who was personally known to respondent used aliases to obtain some of the loans.

The Co–Conspirators used 116 fraudulent appraisals, each of which had been inflated by at least $50,000 to obtain loans from National City Mortgage. The Co–Conspirators pled guilty to federal felony conspiracy charges and admitted to obtaining inflated amounts totaling $13,000,000.

Respondent closed eighty-eight loans for the Co–Conspirators with inflated appraisals of at least $25,000 each. Respondent did not share in the profits from the fraudulently obtained loans, but he did benefit from significant business generated by the various mortgage brokers involved. Additionally, respondent charged a fee of $175 for the title search on each closing. In cases of flip transactions done simultaneously on the same property, there is no need for a second title search. Respondent essentially double-billed for this work.

On June 3, 2004, respondent pled guilty to one count of conspiracy to commit mail fraud in the United States District Court arising out of his involvement in the above-described activities relating to the National City Mortgage loans. As of the date of the Agreement for Discipline by Consent, respondent had not been sentenced.

## VII.

Respondent conducted a closing on a refinancing loan for Client F in September 2002. Respondent issued and mailed a check to Client F's existing lender to pay off her mortgage. In December 2002, Client F received a notice from her lender that payment had not been received. When respondent received a copy of this notice, he reissued payment to the lender with a request that it apply the payment retroactively to September. The lender would not comply with this request and returned the check as insufficient to pay the debt. In March 2003, Client F received a delinquency notice. At that time, respondent paid the full amount claimed by the lender using his firm's funds to make up the shortage.

Although respondent maintained a separate trust account for the Greenville office and kept some financial records there, primary bookkeeping and account reconciliation were conducted by non-lawyers in the Charlotte office. Respondent did not supervise this process and was not informed of discrepancies in the trust account. Additionally, non-lawyers in respondent's Greenville office often placed checks returned by lenders and deeds or mortgages returned by the RMC office into the closing files without alerting respondent to the problem. For these reasons, respondent was unaware that the two checks issued to Client F's lender did not clear the bank in a timely fashion but sat non-negotiated in Client F's file. It was not until Client F contacted respondent with her delinquency notices that respondent took action to correct the situation.

## VIII.

At the request of Client G's lender, the Greenville office conducted a closing for Client G in July 2001. Due to miscommunication on the lender's part, both respondent's firm (on behalf of Client G) and the lender ordered title searches on the property. Respondent issued a title opinion and paid out funds from the closing for his title search and for a title policy. When the lender learned it would have to pay for the title work it conducted, the lender demanded respondent reimburse it for this expense, claiming respondent was hired solely to "witness" the closing.

Initially, respondent refused to refund the money, asserting his firm's policies prohibited "witness-only" closings and required their own title work. In order to maintain a good working relationship with the lender, however, respondent decided to pay $500 to share in the loss. The check to Client G's lender was written on the Greenville office's operating account. The check was returned for insufficient funds. Respondent was unable to explain the deficiency because all accounting and bookkeeping for the operating account had been transferred to the Charlotte office. The firm ultimately paid the lender $500 plus bank fees incurred as a result of the returned check.

## *IX.*

In October 2002, respondent conducted a loan closing for Client G. At the closing, he withheld an estimated payment for the property taxes that would become due in January 2003. In January 2003, payment was issued to the tax authority for the amount withheld, however, the estimate was lower than the actual taxes due. Client G contacted respondent's office in June 2003 to inform him that she had received a delinquent tax notice. Payment was reissued in the full amount with respondent's firm paying the difference. Client G made numerous attempts to get information from respondent about the status of her tax payment. She had no success. In fact, at the time she filed her disciplinary complaint, the matter had been resolved but respondent had failed to inform Client G.

Respondent acknowledges that, due to his insufficient supervision of the firm's accounting practices, he was unaware the tax check did not clear the bank for six months. He acknowledges that the volume of real estate closings he was attempting to accomplish in the Greenville office led to misfiling and misplacing important documents such as the trust account check that was returned by the tax office. Respondent further acknowledges that his delegation of the responsibility to respond to Client G's inquiries was not sufficient to meet his obligation to adequately communicate with his client.

## *X.*

In April 2002, respondent conducted a closing on the sale of property from Mr. H to Mr. I. In the transaction, Mr. H was

selling a portion of a tract of land encumbered by a mortgage owed by Mr. H. The agreement provided Mr. H's lender would accept $35,000 in exchange for a release of the portion of the property being purchased by Mr. I. Mr. I obtained a loan on the property and, by June 2003, had paid it off. Mr. I then attempted to borrow additional funds using the property as collateral. In the course of closing on this second loan, it was discovered that Mr. H's mortgage still encumbered the portion of the property now owned by Mr. I.

In May 2002, after the closing on the sale from Mr. H to Mr. I, respondent had issued payment to Mr. H's lender. However, the lender did not accept the payment or release its mortgage because certain documentary requirements had not been met by respondent at the time of the closing. Respondent's file contains no record of receiving the check back from the lender, although the lender did produce a cover letter indicating that it had sent the check back. The firm ultimately paid $35,000 plus interest to the lender and obtained a release of Mr. I's portion of the property.

From the time of the closing in April 2002 until payment was made in August 2003, the balance in respondent's trust account remained sufficient to cover the $35,000 withheld from the closing. Respondent admits that his failure to adequately supervise the firm's trust accounting procedures resulted in his failure to know that the check to Mr. H's lender had never cleared the bank. He also acknowledges that the volume of real estate closings he was attempting to accomplish in the Greenville office led to misfiling and misplacing important documents such as the payoff check that Mr. H's lender returned.

## XI.

For each of the law offices in which closings on South Carolina properties were handled (Greenville, Rock Hill, Charleston, and Charlotte), Robert Forquer and Scott Green opened a bank account called the "recording" account. When funds were collected at closing to pay fees for the recording of mortgages, deeds, and other documents, a check in the amount collected would be written from the real estate trust account and deposited into the recording account for that

office. Checks to the appropriate county office would, in turn, be written from the recording account and delivered with the documents to be filed. The firm routinely and intentionally overcharged clients for these recording fees and failed to reimburse the amounts not used for the designated purpose. The overcharges ranged from $2.00 to $40.00 per closing.

The recording accounts were also sometimes used for processing the entire closing. The firm failed to maintain sufficient records of the recording accounts and failed to identify and track client funds maintained in the accounts. No record was kept in the closing files of the actual amounts paid for recording fees and no accounting of overcharges to the clients was kept. The overcharges for the recording fees were separate from the attorney's fees and courier fees charged to clients.

The funds in the recording accounts were used for a variety of purposes other than document recording fees, including office expenses (stamps, bank charges, staff lunches), correction of errors in closings (payoff shortages and miscalculation of title insurance premiums), settlement of minor claims against the firm, payroll or other payments to staff, and checks to Mr. Forquer and Mr. Green in various amounts, including checks for $4,000 and $7,000.

The source of the funds in the recording accounts (client charges and overcharges for recording fees) was insufficient to cover the firm's uses of the account. As a result, the accounts were frequently short of funds. Mortgages, deeds, and other closing documents were routinely held and not timely filed because there were insufficient funds in the recording account to pay the recording fees. Occasionally, associates used their own money to pay recording fees and then sought reimbursement from the firm.

In the Greenville office, a paralegal with signatory authority on the recording and real estate trust accounts wrote a series of approximately twenty-five checks payable to herself or to cash in various amounts. This paralegal was also responsible for reconciling the recording account and maintaining records associated with it. Upon receipt of the cancelled checks, the paralegal altered the payee to make it appear that the checks had been written to county offices for legitimate purposes.

Using this method, the paralegal took approximately $46,000 from the recording account.

Although he was unaware of the paralegal's activities in this regard, respondent had supervisory authority over the employee. From February 2003 through May 2004, the Greenville recording account had insufficient fund charges of approximately $11,522.

Respondent acknowledges that the recording accounts were client trust accounts. He further acknowledges that, as a partner in the Greenville, Charleston, and Charlotte offices, he shared responsibility for the safekeeping of client funds and for maintaining certain financial records. Respondent acknowledges that the use to which his firm put the recording account funds constituted mismanagement, commingling, and misappropriation.

## *LAW*

Respondent admits that by his misconduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to a client); Rule 1.3 (lawyer shall act with reasonable diligence and promptness in representing a client); Rule 1.4 (lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information); Rule 1.15(a) (lawyer shall hold property of clients in the lawyer's possession in connection with a representation separate from the lawyer's own property); Rule 5.1 (partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct); Rule 5.3(a) (a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that a non-lawyer employee's conduct is compatible with the professional obligations of the lawyer); Rule 5.3(b) (lawyer having direct supervisory authority over a non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer); Rule 5.3(c) (lawyer shall be responsible for conduct of a non-lawyer that would be a violation of the Rules of Professional Conduct if engaged in

by a lawyer if either the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved or the lawyer is a partner in the law firm in which the non-lawyer is employed, or has direct supervisory authority over the non-lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take remedial action); Rule 5.5(b) (lawyer shall not assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law); Rule 8.4(a) (it is professional misconduct for a lawyer to violate the Rules of Professional Conduct); Rule 8.4(b) (lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects); Rule 8.4(d) (it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(e) (it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice).

In addition, respondent admits his conduct violated Rule 417, SCACR. Respondent admits his misconduct is grounds for discipline under Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (it is a ground for discipline for lawyer to violate Rules of Professional Conduct); Rule 7(a)(4) (it is a ground for discipline for lawyer to be convicted of a crime of moral turpitude or a serious crime); Rule 7(a)(5) (it is a ground for discipline for lawyer to engage in conduct tending to pollute administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law); and Rule 7(a)(6) (it is a ground for discipline for lawyer to violate oath of office).

## CONCLUSION

We accept the Agreement for Discipline by Consent and disbar respondent. Respondent's request that the disbarment be made retroactive to the date he was placed on interim suspension is denied.

Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and

shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.